**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4879-16T2

BERMAN, SAUTER, RECORD &
JARDIM, PC f/k/a RAMSEY
BERMAN, PC,

     Plaintiffs,

v.

ART ROBINSON, AOR HOLDINGS,
INC., DTH15, LLC, OWEN PROPERTIES,
LLC, and RIGHTER EQUITIES, LLC,

     Defendants,

and

DTH15, LLC,

     Third-Party Plaintiff-Appellant,

v.

HERSH, RAMSEY & BERMAN, PC,
J. DAVID RAMSEY, ESQ.,
KENNETH R. SAUTER, ESQ.,
and EDWARD A. BERMAN, ESQ.,

     Third-Party Defendants-Respondents.

_____

Argued September 13, 2018 – Decided March 26, 2019

Before Judges Nugent and Reisner.

On appeal from Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1181-08.

Kenneth S. Thyne argued the cause for appellant (Roper & Thyne, LLC, attorneys; Kenneth S. Thyne, on the brief).

Robert C. Neff, Jr., argued the cause for respondents (Wilson, Elser, Moskowitz, Edelman & Dicker LLP, attorneys; Kurt W. Krauss, of counsel and on the brief; Robert C. Neff, Jr., on the brief).

PER CURIAM

Third-party plaintiff, DTH15, LLC, (DTH), appeals from an order that excluded the testimony of its expert and dismissed its legal malpractice action against its former attorney. The expert opined that the attorney, third-party defendant Kenneth R. Sauter, committed malpractice when he failed to include an express termination clause in a commercial real estate contract between DTH and Blue & Gold Development Group, Inc. (Blue & Gold). That omission, according to the expert, enabled Blue & Gold to engage in protracted litigation when it could not close, thus delaying DTH's ability to sell the real estate to others and causing DTH to sustain other damages. The trial court determined the expert's opinion on causation was a net opinion, excluded it, and dismissed

2

the complaint. Because a trial court's decision to admit or exclude expert testimony rests within the court's sound discretion, and because our review of the record in this case reveals no abuse of discretion, we affirm.

## I.

### A.

This action's lengthy procedural history is well known to the parties and well documented in previous appeals,[1] so we need not repeat it in its entirety. In the last appeal, we concluded the trial court had improvidently granted third-party defendants' motion in limine to bar DTH's liability expert. Berman, Sauter, Record & Jardim, P.C., No. A-5650-11, slip op. at 2-3. We remanded for a Rule 104 hearing. N.J.R.E. 104. DTH appeals from the order the court entered after the hearing.

### B.

The gist of DTH's malpractice claim was that Kenneth R. Sauter, an attorney who represented DTH when it entered into a contract to sell fifteen

---

[1] Blue & Gold Dev. Grp, Inc. v. DTH15, LLC, No. A-0278-06 (App. Div. Feb. 13, 2008); Berman, Sauter, Record & Jardim, P.C. v. Robinson, No. A-5650-11 (App. Div. Feb. 3, 2015), rev'd, 224 N.J. 278 (2016); Berman, Sauter, Record & Jardim, P.C. v. Robinson, No. A-5650-11 (App. Div. Nov. 17, 2016).

acres of land to Blue & Gold, deviated from accepted standards of legal practice by not including an express termination clause in the agreement of sale.[2] DTH's expert based his opinion in large part on the facts developed during the underlying lawsuit Blue & Gold filed after it could not close and DTH terminated the contract. These are the facts.

In a contract dated August 15, 2003, DTH agreed to sell to Blue & Gold fifteen acres of undeveloped land in Sparta, Sussex County (the "Property"), for $4,000,000. In Section 4.1, the contract required Blue & Gold to obtain all governmental approvals needed to develop the property within "eight (8) months commencing and following July 5, 2003." Section 4.2 gave Blue & Gold the option, for consideration, to extend this approval period twice: first for ninety days, then for an additional ninety days in thirty day increments. Critical to DTH's malpractice claim, Section 4.3 provided in pertinent part:

> In the event this Agreement shall be terminated as a result of [Blue & Gold's] inability to obtain the Approvals . . . the Deposit shall be returned . . . and [Blue & Gold] shall, upon request by [DTH], assign all its rights it may have with respect to the applications and Approvals and any related plans, tests, studies, investigations, reports, etc. to [DTH].

---

[2] The third-party defendants include other attorneys and a law firm. For ease of reference, we refer to Sauter only.

DTH's principal had stressed to Sauter DTH's need to market the Property quickly and not have it tied up by Blue & Gold if Blue & Gold could not close. Notwithstanding this concern, neither Section 4.3 nor any of the contract's sections included a provision expressly authorizing DTH to terminate the contract.

Concerning closing, Section 7.1 provided that closing of title would take place "on or before the day which is [fifteen] days following the date upon which [Blue & Gold] has received the Approvals, . . . non-appealable preliminary and final Approvals from the Sparta Township Zoning Board and any other governmental agenc[ies.]"

Blue & Gold thus had until September 1, 2004 — if it exercised all extension options — to obtain approvals and close on the Property. In August 2004 — the month before the extension options expired — the Governor signed into law the Highlands Water Protection and Planning Act (Highlands Act), N.J.S.A. 13:20-1 to -35. The Highlands Act established the Highlands Water Protection and Planning Council, which was charged with the responsibility for land use planning for the Highlands Region, a preservation area that included the Property. The Highlands Act delegated to the New Jersey Department of Environmental Protection (DEP) responsibility to establish a permitting review

A-4879-16T2

program for development in the preservation area. N.J.S.A. 13:20-31 to -35. Blue & Gold claimed approvals it needed from DEP had been delayed in anticipation of, and due to, the enactment of the Highlands Act.

Blue & Gold did not receive the approvals needed to develop the Property before September 1, 2004, the expiration of the last of the extension options in the parties' contract. Approvals not received included DEP's approval of amendments to a New Jersey Pollutant Discharge Elimination System (NJPDES) permit, a prerequisite to Blue & Gold obtaining a Treatment Works Approval (TWA) for sewer treatment facilities to be built on the Property. When Blue & Gold refused to pay consideration for further extensions, DTH's principal instructed Sauter to schedule a closing and assert that time was of the essence. Sauter wrote to Blue & Gold's attorney on September 8, 2004, demanding that closing occur as provided for in paragraph 7.1 of the contract. Blue & Gold did not respond, but three weeks later it filed a Highlands Exemption Application and sent a copy to DTH.

On October 13, 2004, Sauter's law partner wrote to Blue & Gold's attorney and scheduled a "time of the essence" closing for November 15, 2004. Blue & Gold "rejected" DTH's position based on Blue & Gold's interpretation of the contract, namely, closing need not occur until all approvals for development of

the Property had been obtained. On December 3, 2004, Sauter wrote to Blue & Gold, asserted that DTH had appeared for closing but Blue & Gold had not appeared, and terminated the contract. Blue & Gold responded by reiterating that DTH did not have the right to terminate the contract.

The following year, in August 2005, apparently after learning that another developer was interested in acquiring the property from DTH for more than double the amount Blue & Gold was to pay, Blue & Gold filed a lis pendens and a Chancery Division action against DTH. Blue & Gold sought specific performance and other equitable relief. The Chancery Division judge entered a preliminary restraint on September 1, 2005, but the next month, in an order dated October 12, 2005, vacated the preliminary restraint and discharged the lis pendens.

The Chancery Division judge also denied, in part, DTH's cross-motion for partial summary judgment. In a written opinion, the judge explained:

> The court is not persuaded that under the terms of the Agreement, [DTH] had no power of termination. The plain language of Paragraphs 4.1a and 4.2 supra, reveals that the parties agreed that [Blue & Gold] would have [eight] months to obtain the necessary approvals. A possibility for two [ninety] day extensions was further agreed upon. As such, [Blue & Gold] had a total of [fourteen] months to comply with the approval contingency. When Paragraphs 4.1a and 4.2 are read in conjunction with the contract as a whole, including

7

Paragraph 4.3 which provides in pertinent part, "in the event this Agreement shall be terminated as a result of [Blue & Gold's] inability to obtain the Approvals set forth in Section 4" it is implicit that the Agreement could be terminated by [DTH] after the [fourteen] month period.

Notwithstanding this finding, genuine issues of material fact exist as to whether it was reasonable for [DTH] to exercise its right to terminate the Agreement under the circumstances. While the [c]ourt finds that there is no evidence that [DTH] contributed to delaying the approval process, [Blue & Gold] has maintained that had it not been for the introduction, passage and associated administrative delays in connection with the [Highlands Act], [Blue & Gold] would have been able to close. A finding that material issues of fact remain precludes a grant of summary judgment in this matter. As such the [c]ourt will deny [DTH's] [c]ross-[m]otion.

The Chancery Division judge denied DTH's cross-motion for summary judgment on October 12, 2005, and later denied a motion for reconsideration and transferred the case to the Law Division. On August 4, 2006, a Law Division judge entered an order that granted summary judgment to DTH, dismissed all Blue & Gold's claims, and closed the case. The Law Division judge agreed with the Chancery Division judge that DTH had the implicit right to terminate the contract after the extension periods expired. The judge rejected Blue & Gold's "position that [Blue & Gold] had a right to pursue the missing approvals until

8

they [were] obtained without any drop-dead date." In doing so, the Law Division judge noted:

> Also as pointed out, it was not just the approvals with which the Highlands legislation interfered; it was also the Department of Transportation approval, which was not obtained until after the agreement had been terminated. It is also interesting to note that in the verified complaint filed August 25, 2005, [Blue & Gold] was still not ready to close, and that was almost a full year after the contingency period had expired. This highlights how absurd [Blue & Gold's] position is with regard to its interpretation of the contract provisions.

The Law Division judge also rejected Blue & Gold's contention that DTH had breached the implied covenant of good faith and fair dealing. The judge explained: "The reality is that DTH terminated the agreement in response to the inflexible and unreasonable position taken by Blue & Gold with regard to its interpretation of the contract that DTH must simply wait indefinitely for Blue & Gold to obtain the missing approvals."

Blue & Gold appealed from the Law Division judge's memorializing order. The Appellate Division affirmed the order in a short opinion. After an introductory sentence and enumeration of Blue & Gold's point headings, the Appellate Division wrote:

> After carefully considering the record, briefs, and oral argument, we are satisfied that all of plaintiff's

9

> arguments are without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E), and we affirm substantially for the reasons expressed by Judge Farber in his thorough and well-reasoned oral and written opinions.
>
> Affirmed.
>
> [Blue & Gold Dev. Grp., Inc., No. A-0278-06 (slip op. at 2-3.)]

The Appellate Division's decision was issued more than three years after DTH had terminated the contract with Blue & Gold. Following the Appellate Division's decision, plaintiff in this action, Berman, Sauter, Record & Jardim, P.C., filed a complaint against DTH and other defendants to recover unpaid fees. DTH filed a counterclaim and third-party legal malpractice complaint. That led to protracted litigation, the appeals we have referenced previously, the remand, the remand hearing, and this appeal. Against this backdrop, we turn to DTH's expert's testimony at the Rule 104 hearing that a third judge (the remand judge) conducted following the remand.

## II.

The expert, Erwin D. Apell, qualified as an expert in the field of real estate and accepted standards of legal practice in real estate matters. Neither his qualifications nor his opinion that Sauter deviated from accepted standards of

10

legal practice are at issue on this appeal.[3]  For that reason, we recount only his testimony on proximate cause.

Apell testified that Sauter's negligence was a substantial contributing factor to damages suffered by DTH.  These damages included DTH's inability to market the property during years of litigation, and the consequent carrying costs.  The damages also included the lost opportunity to sell the Property for a substantial profit.  In addition, DTH incurred considerable expense to defend against Blue & Gold's lawsuit.

Apell's opinion on proximate cause was based on three possible outcomes of Blue & Gold's dispute with DTH, and each outcome was in turn based on the supposition the parties' contract contained an express termination clause.  These were the outcomes according to Apell.  First, Blue & Gold might have refused to enter into a contract with an express termination clause.  Second, Blue & Gold might not have filed a lawsuit because such a lawsuit would have been frivolous and would have exposed Blue & Gold to sanctions for filing frivolous litigation.  Third, Blue & Gold would have filed the frivolous lawsuit, but the Chancery Division judge would have granted DTH summary judgment and dismissed the

---

[3]  That is not to suggest that either Sauter or the other third-party defendants agreed with Apell.  They sharply disputed his opinion, as did their own expert on accepted standards of legal practice in real estate matters.

11

case, because there would have been no "loophole" alleging DTH unreasonably exercised its right to terminate in view of the unforeseeable delays caused by the Highlands Act.

As to the first possibility — Blue & Gold would not have entered into the contract — Apell conceded this scenario was "unlikely." He testified that "probably . . . Blue & Gold would have caved in because they really wanted the project and would have signed the agreement of sale. . . ."

Apell did not elaborate on the second possibility — Blue & Gold would have been deterred from filing the lawsuit because doing so in the face of an express termination provision would have exposed it to frivolous litigation sanctions. He cited nothing in the record from which such a result could have been inferred.

Apell did elaborate on the third possibility — that the Chancery Division judge would not have denied DTH summary judgment. Apell explained that in the Chancery judge's opinion denying DTH summary judgment, the judge "clearly indicated . . . DTH did nothing wrong." Apell further explained that in view of such a finding, an express termination provision would "override" any argument based on an alleged breach of the implied covenant of good faith and fair dealing. Apell added that even if Blue & Gold appealed such a decision,

12

the Appellate Division would have expeditiously disposed of the appeal "by streamlining to say there [are] no facts on the appeal that we've got to hear, and dismiss it."

During cross-examination, Apell conceded the likelihood "[t]here would have been litigation" even if the contract contained a termination clause, but he stressed, "it's the time it would take to complete the litigation that is important in this case." Although he could not say precisely how long the litigation would have lasted, he insisted "it would be faster if the termination date was in [the contract] than if the termination date is not in there. . . ." He added, "I'm saying generally speaking if a contract is clear, a court should be able to dispose of [litigation] faster than if the contract is unclear. That's all I'm saying."

Apell did not know how long it would have taken the Chancery judge to dismiss Blue & Gold's complaint. He also conceded that even if the contract had contained an express termination clause, such a clause would not have foreclosed a claim "based on the duty of good faith and fair dealing[.]" On redirect, however, in response to the question, "hasn't our Supreme Court said that the covenant of good faith and fair dealing will not override an express termination provision," Apell said, "I believe so."

Following the Rule 104 hearing, the remand judge found Apell's opinion on proximate cause to be a net opinion. The judge noted DTH and Apell had "not presented any evidence to suggest that if there was an express termination clause in the Contract, Blue & Gold would not have still filed suit alleging breaches of the implied covenant of good faith and fair dealing in light of the introduction and passage of the Highlands Act and the resulting administrative delays."

Concerning Apell's opinion that the Chancery Division judge would have granted summary judgment to DTH, the remand judge determined this argument overlooked the Chancery Division judge's opinion concerning the administrative delays caused by the Highlands Act. Moreover, the Chancery Division judge found DTH had an implicit right to terminate the contract, and his decision to permit Blue & Gold to proceed with the litigation had nothing to do with the absence of an express termination clause. The Chancery Division judge did not find DTH's right to terminate the contract to be unclear.

Citing language in Sons of Thunder v. Borden, Inc., 148 N.J. 396, 421 (1997), the remand judge noted, "[t]he obligation to perform in good faith exists in every contract, including those contracts that contain express and unambiguous provisions permitting either party to terminate the contact without

cause." For these reasons, the remand judge found that Apell's opinion was supported by neither the Chancery Division judge's opinion nor case law.

In short, the remand judge found "Apell's opinions pertaining to proximate causation [to be] unsupported by any relevant factual evidence or applicable case law." Rather, according to the remand judge, Apell's opinions were based on nothing more than speculation and possibilities. Thus Apell's opinions on proximate cause were impermissible net opinions. DTH having presented no other evidence concerning causation, the remand judge concluded DTH had failed to present a prima facie case of legal malpractice against Sauter. The judge barred Apell's net opinions and dismissed the legal malpractice complaint with prejudice.

## III.

On appeal, DTH argues that the remand judge's decision misconstrues the Chancery Division judge's opinion concerning the implied covenant of good faith and fair dealing. DTH also argues the remand judge's decision usurps the province of the jury. We disagree.

To establish a prima facie case of legal malpractice, a plaintiff must prove "(1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3)

proximate causation of the damages claimed by the plaintiff." Granata v. Broderick, 446 N.J. Super. 449, 469 (App. Div. 2016) (quoting McGrogan v. Till, 167 N.J. 414, 425 (2001)). To prove proximate causation, a plaintiff must establish that a defendant-attorney's breach of duty was a substantial factor in bringing about plaintiff's damages. Conklin v. Hannoch Weisman, 145 N.J. 395, 422 (1996).

Here, DTH sought to prove the elements of its legal malpractice claim through the testimony of its expert. An expert's opinion must be based on "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)). If an expert's conclusions are unsupported by factual evidence or other data, they are excludable as net opinions. Id. at 53-54.

The net opinion rule "mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). Consequently, an

expert's opinion is inadmissible if it is based on nothing more than speculation or unquantified possibilities. Ibid.

We review with deference a trial court's decision to admit or exclude expert testimony. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371-72 (2011). That is so because "[t]he admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend, 221 N.J. at 52-53 (citing State v. Berry, 140 N.J. 280, 293 (1995)). Accordingly, "[a] reviewing court must apply an abuse of discretion standard to a trial court's determination, after a full Rule 104 hearing, to exclude expert testimony on unreliability grounds." In re Accutane Litig., 234 N.J. 340, 391 (2018) (citing Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008)). Applying that standard to the case before us, we affirm the remand judge's decision.

Preliminarily, we note that Apell was qualified as an expert in the field of real estate and accepted standards of legal practice in real estate matters, not in matters of trial practice or appellate practice. Yet, in rendering his opinion on proximate cause, he implicitly and explicitly rendered opinions in the latter areas, and he speculated about what advocates and judges might do when confronted with certain issues and arguments.

17

Apell's opinion concerning proximate cause was based on three possibilities. The speculative nature of Apell's first supposition — that Blue & Gold would not have signed the contract with an express termination clause — is readily apparent from Apell's own report and testimony. He acknowledged this scenario was unlikely and that Blue & Gold probably would have "caved in because they really wanted the project and would have signed the agreement of sale." No evidence, observations, or data supported the possibility that Blue & Gold may have walked away from the deal. Apell's suggestion that such was a possibility was thus a net opinion.

Similarly, Apell's second scenario — Blue & Gold would not have filed a frivolous lawsuit — was unsupported by facts or data, was merely speculative, and was thus a net opinion. Apell cited no evidence in the record from which one could infer this was a likely scenario. The facts in the record support the contrary inference.

When the Law Division judge dismissed Blue & Gold's complaint on summary judgment, he noted Blue & Gold needed approvals not only from DEP but also from the Department of Transportation. The latter approvals were not obtained until after DTH had terminated the contract. In addition, the judge noted that when Blue & Gold filed its complaint nearly a year after the contract's

A-4879-16T2

final contingency period had expired, it was still not ready to close. In view of these facts, the Law Division judge characterized Blue & Gold's position as absurd. Yet, Blue & Gold was undeterred from asserting such an "absurd" position. No evidence in the record suggests Blue & Gold would have taken a different course of action had the contract contained an express termination clause.

The third scenario posited by Apell — that the Chancery Division judge would have dismissed Blue & Gold's complaint on summary judgment and the Appellate Division would have expedited any appeal — is also unsupported by any evidence or data, and it is based on nothing more than speculation. The Chancery Division judge found that DTH had not delayed the approvals and that DTH had the implicit right to terminate the contract with Blue & Gold. Yet, the judge believed there was a genuinely disputed issue of fact as to whether DTH acted reasonably in light of the unforeseen delays caused by the Highlands Act. The judge did not provide an in-depth analysis concerning this conclusion.

DTH argues that because an express termination clause would have "overridden" the implied covenant of good faith and fair dealing, there would have been no factual dispute, and the Chancery Division judge would have granted summary judgment. Although "the implied covenant of good faith and

fair dealing cannot override an express termination clause," <u>Sons of Thunder</u>, 148 N.J. at 419, "a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate." <u>Id.</u> at 422.

The remand judge found significant the Chancery Division judge's determinations that DTH was not responsible for any delays Blue & Gold encountered in obtaining approvals and that DTH had the right to terminate the contract. Nonetheless, the Chancery Division judge determined there was a genuinely disputed material issue of fact as to whether DTH breached the implied covenant of good faith and fair dealing in performing its obligations when it exercised its right to terminate, particularly in view of the unforeseeable enactment of the Highlands Act. In view of those determinations by the Chancery Division judge, the remand judge concluded that Apell's opinion concerning the third proposition — the outcome of DTH's motion in the Chancery Division would have been different — was unsupported and speculative.

We reiterate that our task is not to determine whether the Chancery Division judge correctly or incorrectly decided DTH's summary judgment motion, nor are we to substitute our opinion for that of the remand judge. Rather,

20

we must determine whether the remand judge abused his discretion by excluding Apell's testimony. For the reasons expressed in this opinion, we conclude he did not. Accordingly, we affirm the order excluding Apell's testimony and dismissing DTH's malpractice complaint with prejudice.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21                                                              A-4879-16T2